903 P.2d 1305

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Bryan Stuart LANKFORD,
Defendant–Appellant.**

No. 20672.

Supreme Court of Idaho,
Moscow, April 1995 Term.

Sept. 1, 1995.

Rehearing Denied Oct. 30, 1995.

Joan M. Fisher, Genesee, for defendant-appellant.

Larry EchoHawk, Attorney General, Michael Kane and Lynn E. Thomas, argued, Deputy Attorneys General, Boise, for respondent.

SCHROEDER, Justice.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

Bryan Stuart Lankford (Lankford) appeals from two consecutive life sentences which were imposed by the district court on resentencing. The case involves a complex history.

Lankford was convicted by a jury of two counts of First Degree Felony Murder in 1984:

Evidence at trial disclosed that in June, 1983, Lankford was living in Texas on probation for a robbery conviction. Lankford was arrested for a DUI violation. Fearing that this violation of his probation would lead to his imprisonment, he fled the state with his older brother, Mark Lankford, in the latter's car. The pair eventually made their way to Idaho County, where they camped in the forest near Grangeville. They concluded that, because the monthly payments on Mark Lankford's car were delinquent, the police would be searching for it and that they needed to abandon the car to avoid capture. They left the car in the woods covered with brush and set off to steal another car.

The brothers came upon the Bravences' campsite and decided to take the Bravences' van. Bryan Lankford walked into the camp armed with a shotgun and engaged the Bravences in conversation. Subsequently, Mrs. Bravence left the group and went to a nearby creek. At this point, Mark Lankford ran into the campsite and ordered Robert Bravence to kneel down on the ground. While kneeling, Mark then hit Robert Bravence over the head with a nightstick. Cheryl Bravence then came up from the creek, and Mark told her to kneel down on the ground and then hit her over the head with the same nightstick. The Bravences were beaten with such force that their skulls had to be reconstructed by an anthropologist before the cause of death could be scientifically determined.

The brothers loaded the bodies into the van and headed back into the forest. The bodies were removed from the van and concealed under branches and other debris a short distance from where the Lankfords had abandoned their car. Lankford and his brother then took the van and traveled through Oregon and California before abandoning it in Los Angeles. During their flight from the murder scene they purchased accommodations and food with the Bravences' credit card.

*State v. Lankford,* 113 Idaho 688, 691, 747 P.2d 710, 713 (1987).

Following post-conviction proceedings, Lankford filed a consolidated appeal. This Court affirmed the judgment and sentence in *State v. Lankford,* 113 Idaho 688, 747 P.2d 710 (1987). Most of the issues Lankford raised in that appeal are no longer of consequence in this appeal. However, as in the present appeal, Lankford sought enforcement of an immunity agreement according to his interpretation of the document. This Court reviewed the agreement and held that:

> After Lankford was convicted of two counts of felony murder, but before sentencing, the state entered into an immunity agreement with him under I.C. § 19–1114 in order to obtain his testimony against his brother. Lankford contends that this grant of immunity (which was after the verdict but prior to his sentencing) deprived the district court of the authority to sentence the defendant. We conclude that the district court did not err when it found that the immunity agreement (Defendant's Exhibit # 1) between the state and Lankford did not immunize Lankford from sentencing for the crimes for which he had already been convicted when the agreement was entered into.

> I.C. § 19–1114 states in part that, "If ... the person would have been privileged to withhold the answer given ... that person shall not be prosecuted or subject to penalty ... *on account of any fact or act concerning which ... he answered.*" (Emphasis added.) By its clear wording, the statute does not apply in this case. None of the testimony given by Lankford pursuant to the immunity agreement was used to prosecute or to punish Lankford. Instead of providing retroactive protection, the immunity agreement was prospective in effect and protected Lankford from any other charges that might have been brought pursuant to his use of the Bravences' property.

*Id.* at 695–96, 747 P.2d at 717–18 (footnote omitted). The Court elaborated on its reasoning in a footnote:

> Lankford asserts that the district court judge used the immunized testimony in its findings of fact to support the imposition of the death penalty. However, the record does not support that assertion. While the district court described Lankford's testimony at his brother's motion for new trial in its sentencing memorandum, it was not considered as an aspect of any of the statutory aggravating circumstances found by the court. During the district court's oral discussion of the sentence, the judge stated:

> > "The defendant has shown no remorse for his offenses. He has not cooperated with authorities after his arrest. He has told authorities that he and his brother had nothing whatsoever to do with the death of the Bravences. He has testified that his brother was alone involved in the murders. He has testified on October 10, 1984 in the companion case, *State v. Mark Lankford,* Idaho County Case No. 20158, that he called the *Lewiston Tribune* and claimed that it was he alone who murdered the Bravences. This he later denied and offered the explanation which is set forth in the addendum to the presentence investigation report under date of October 3, 1984, to the effect that it was simply part of a plan that would secure freedom for his brother, who could in turn free him."

> Although it is true that the district court judge pointed out the conflicting testimony given by Lankford at various times, including the testimony given pursuant to the immunity agreement, there has been no showing that the sentence was based upon the comments quoted above.

113 Idaho at 696 n. 7, 747 P.2d at 718 n. 7.

Lankford sought review in the United States Supreme Court. The United States Supreme Court vacated this Court's judgment and remanded "for further consideration in light of *Satterwhite v. Texas,*" 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). *Lankford v. Idaho,* 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988). Following the order of the United States Su-

preme Court, this Court in turn vacated its earlier remittitur and reheard the appeal. *State v. Lankford*, 114 Idaho 817, 761 P.2d 1169 (1988).

On rehearing this Court considered the holding of *Satterwhite* that harmless error applies to violations of the Sixth Amendment right set out in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (in capital cases defendants have a right to confer with counsel before submitting to a psychological examination aimed at determining future dangerousness). Noting that Lankford had at no point raised a Sixth Amendment violation, this Court nevertheless assumed "that *Satterwhite* applies equally where a [F]ifth [A]mendment violation is shown." *State v. Lankford*, 116 Idaho 279, 281, 775 P.2d 593, 595 (1989). The Court then quoted in its entirety footnote 7 from the original decision (set forth above) and held "we continue to adhere to the view expressed in footnote 7 of our original opinion. Accordingly, we find no factual predicate for Lankford's claim." *Id.* The Court then proceeded to outline an alternative holding that, even if it were assumed that the district court had considered Bryan Lankford's testimony given at Mark Lankford's new trial hearing, no Fifth Amendment violation occurred because Bryan Lankford had waived his privilege against self-incrimination by voluntarily testifying in his own defense during his own trial. The Court also held that even if Lankford had not testified at his own trial the immunity agreement constituted a valid waiver of his Fifth Amendment privilege. The Court thus reaffirmed its prior decision.

Lankford successfully sought review in the United States Supreme Court a second time. The United States Supreme Court reversed this Court again, but on an issue entirely separate and unconnected to the *Satterwhite* issue which was the basis of the first order to vacate.[1] In *Lankford v. Idaho*, 500 U.S. 110,

111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), the United States Supreme Court held that Lankford's rights to due process of law were violated by the district court's imposition of the death penalty without giving Lankford sufficient notice that it might do so, because the state had earlier filed written notice that it would not request the death penalty. The judgment of this Court was reversed and the case was remanded "for further proceedings not inconsistent with this opinion." *Id.* at 128, 111 S.Ct. at 1733.

This Court then remanded the case back to the district court. On motion of the Idaho County Prosecuting Attorney, the Attorney General's Office was appointed to prosecute the case in all further proceedings. The original sentencing judge, Judge Reinhardt, granted the defendant's motion for disqualification and the matter was assigned to Judge Schilling.

The Attorney General's Office then filed a "Notice of the Intention to Seek The Death Penalty." Thereafter the trial court filed a written notice that it intended to consider imposing the death penalty. Lankford filed a "Motion to Enforce Immunity Agreement" which was denied. Lankford also filed a "Motion to Strike State's Notice and Specifically Enforce Sentencing Agreement." The district court by written decision and order partially granted this motion.

Judge Schilling reviewed the record and the findings of Judge Reinhardt and held that the state had promised to recommend an indeterminate life sentence in exchange for Lankford's testimony and cooperation. The court held that this promise was enforceable because the defendant's cooperation had already been rendered and could not be withdrawn. The court also held that the state's initial promise was still binding and enforceable at the resentencing despite the state's argument that the promise, if it existed, was only binding with respect to the initial sen-

1. Other than detailing the procedural history of the case and making a passing mention of the earlier order vacating this Court's judgment and remanding to consider *Satterwhite*, the United States Supreme Court never discussed this Court's reaffirmation of its earlier ruling notwithstanding *Satterwhite*.

tencing. Before crafting a remedy for the enforcement of the sentencing agreement, the district court considered Lankford's claim that the prosecution's request for the death penalty at the resentencing was vindictive and therefore violated his rights to due process. The district court concluded that Lankford had made a sufficient showing to raise a presumption of vindictiveness which the prosecution had failed to rebut.

In order to enforce the original sentence agreement and remedy the prosecution's presumptively vindictive request for the death penalty, the district court struck the prosecution's request for the death penalty. The district court concluded that consideration of the state's initial sentencing recommendation should also be part of the appropriate remedy. However, the court reasoned that striking the non-binding request of the prosecution did not necessarily mandate exclusion of aggravating evidence or foreclose the court's ability to impose the death penalty.

A sentencing hearing was held at which the state was allowed to present evidence in aggravation. The district court thereafter made findings of fact according to the statutory factors of Idaho Code § 19–2515 and found that none of the aggravating circumstances outweighed the mitigating evidence such that a death sentence should be imposed. The court filed a sentencing opinion sentencing Lankford to two consecutive fixed life terms.

Lankford then filed this appeal.

## II.

## THE STATE'S BREACH OF THE AGREEMENT TO RECOMMEND AN INDETERMINATE LIFE SENTENCE

### A. Existence Of The Agreement

█ The district court found that when Lankford was first sentenced there was a binding sentencing agreement whereby the prosecution agreed to recommend an indeterminate life sentence in exchange for his cooperation in the prosecution of his brother, Mark Lankford. The district court held that the original agreement was still binding at the resentencing. It is necessary to review the district court's finding that an agreement originally existed, because the state now maintains that such an agreement was never entered into.[2]

During the trial of Mark Lankford, Bryan Lankford was questioned about the existence of an agreement for a favorable sentence recommendation in exchange for his testimony and cooperation. Bryan Lankford's answers, although somewhat ambiguous and equivocal, made clear his belief that such a recommendation was forthcoming. At that point Bryan Lankford's trial counsel and the prosecutor both testified that no such agreement existed. The judge presiding at Mark Lankford's trial initially stated his belief that no such agreement existed and that Bryan Lankford was simply mistaken. However, the judge made no findings of fact to that effect and, despite Lankford's testimony that he believed such an agreement was in effect, the state proceeded to allow Lankford to testify without first making a record establishing that Lankford correctly understood the state of affairs. When the judge did make findings of fact in Mark Lankford's post-conviction proceeding, the judge's understanding had also apparently changed, because he found that in fact Bryan Lankford's testimony at Mark Lankford's trial was induced by "a life-sentence recommendation at sentencing." In 1993 Bryan Lankford's trial counsel filed an affidavit in the present case stating that Bryan Lankford's "decision to cooperate" was motivated by the prosecutor's promise "not to seek the death penalty." On the basis of this record, and in conjunction

---

**2.** At one point in its brief, the state appears to argue that there was an agreement for a recommendation but that Lankford breached the agreement through his successful appeals. At another point in its brief, the state seems to suggest that the immunity agreement represents the entirety of the agreement between the parties under

which Lankford testified against his brother. At oral argument, the state directly challenged the existence of any agreement for a recommendation, characterizing the first prosecutor's recommendation for indeterminate life sentences as purely "gratuitous."

with the fact that in 1984 the state did actually make an affirmative recommendation that Lankford receive an indeterminate life sentence, the district court in this case found that an agreement had been entered into whereby the state agreed to recommend an indeterminate life sentence in exchange for Lankford's cooperation in the state's case against Mark Lankford.

The state points to no basis in the record for reversing the district court's conclusion about the existence of the agreement. The state proceeded with the testimony of Bryan Lankford during Mark Lankford's trial knowing that Bryan Lankford believed it was pursuant to an agreement for a recommendation of an indeterminate life sentence. Moreover, the state apparently made no effort to challenge the finding of the trial court in Mark Lankford's post-conviction proceeding that such an agreement existed. Also unrebutted by the state is the 1993 affidavit filed in this case by Bryan Lankford's trial counsel. In summary, two different district courts have concluded that an agreement existed whereby Lankford was entitled to a recommendation for an indeterminate life sentence. The state has submitted no basis upon which to conclude otherwise.

## B. Continued Enforcement Of The Agreement

The district court in this case recognized that even if Bryan Lankford forfeited no rights by testifying at his brother's trial, because of this Court's earlier holding that he waived his privilege against self-incrimination by testifying at his own trial, he had nonetheless provided the prosecution with cooperation. The district court concluded that the sentencing agreement was binding and was subject to specific enforcement at the resentencing, because it could not be retracted. The state maintains that this conclusion of the district court was erroneous, even if a sentencing agreement existed, because the agreement pertained only to the original sentencing.

*Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), is the lead-

ing case recognizing the constitutional dimensions of enforcement of plea bargaining agreements, but the authorities applying the principles of *Santobello* to enforce sentence agreements *after* the original sentencing has already taken place are limited. As the district court noted, some courts have held that the government does not breach a plea agreement where it fulfills its recommendation obligations at the defendant's sentencing but thereafter opposes the defendant's I.C.R. 35 motion for a reduction of sentence. *See, e.g., United States v. White,* 724 F.2d 714, 717 (8th Cir.1984) (government's agreement not to recommend a particular type of sentence was not breached by its opposition to defendant's Rule 35 motion because by arguing to maintain a sentence already imposed the government did not "recommend" any particular type of sentence); *Brooks v. United States,* 708 F.2d 1280, 1282 (7th Cir.1983) (government agreement not to oppose defendant's request for leniency at sentencing did not include a "free shot" by defendant in Rule 35 proceeding); *United States v. Arnett,* 628 F.2d 1162, 1164–65 (9th Cir.1979) (government agreement not to make a recommendation does not bar the government from opposing motion to reduce because there was no evidence that such a restriction was contemplated by the parties); *Bergman v. Lefkowitz,* 569 F.2d 705, 716 (2d Cir.1977) (where court disregards prosecutor's sentence recommendation made as part of plea agreement, prosecutor is free to later oppose defendant's motion to reduce).

Other courts have held that the government's agreement to take a certain position at sentencing forecloses its ability to later take an inconsistent position at a post-sentencing proceeding. *See United States v. Ewing,* 480 F.2d 1141, 1143 (5th Cir.1973) (where plea agreement included an agreement by the government to recommend probation at sentencing, the government is also obligated to recommend a probationary sentence at I.C.R. 35 hearing because that is part of the sentencing process which the defendant was reasonably entitled to expect was included within the agreement); *State v.*

*Wills,* 244 Kan. 62, 765 P.2d 1114, 1120 (1988) (where plea agreement involving favorable sentencing recommendation by state was silent on state's obligations at hearing to modify sentence, ambiguity must be resolved in favor of defendant such that state is bound by earlier recommendation).

Although the two groups of cases disagree about the scope of proceedings encompassed within an agreement that on its face only addresses the initial sentencing, the unifying theme in all of the decisions is the holding that under *Santobello* a defendant is entitled to receive whatever benefit the state actually agreed to provide at the initial sentencing. The two lines of cases only disagree about whether in the individual case the post-sentencing proceedings were contemplated in the negotiations of the parties.

To accept the state's position in this case would necessitate acceptance of the assumption that Lankford and the state entered into an agreement that contemplated the unusual procedural developments in the case. The state would need to show that Lankford agreed to give testimony against his brother in exchange for a one time recommendation by the state for an indeterminate life sentence, but the recommendation would no longer be forthcoming should he successfully appeal and obtain resentencing. In the absence of any evidence in the record suggesting that Lankford entered into such a short-sighted deal the district court correctly resolved the ambiguity in favor of Lankford.

■ Given the prosecution's initial failure to recommend an indeterminate life sentence

at Lankford's resentencing, the next question is whether the district court crafted a sufficient remedy by striking the state's request for the death penalty and holding the state to a recommendation for an indeterminate life sentence.

Lankford argues that he is either entitled to sentencing before a judge who is "untainted" by the state's initial request for the death penalty or, alternatively, that this Court should go a step further and order that the state's recommended sentence actually be imposed. In support of this latter request, Lankford relies on *United States v. O'Brien,* 853 F.2d 522 (7th Cir.1988). The court in *O'Brien* did not hold that the government had breached its obligations under the plea agreement, but the court nevertheless stated in dicta that a governmental breach could be remedied by "ordering the imposition of a specific sentence" if neither specific performance nor allowing the defendant to withdraw the plea would be an adequate remedy. *Id.* at 525–26.[3]

There is no reason why true specific performance would be an inadequate remedy in this case. Lankford argues that it would be more expeditious for this Court simply to modify the sentence on appeal, but economy of time is an insufficient justification for transforming the government's non-binding recommendation into a stipulated . sentence by ordering that it be imposed.

Lankford's next claim is that the remedy crafted by the sentencing judge did not constitute true specific performance, because the sentencing judge had been exposed to the prosecution's impermissible request for a death sentence.

---

**3.** In mentioning the possibility of such an extraordinary remedy, the *O'Brien* court relied on the decision of the First Circuit in *Correale v. United States,* 479 F.2d 944 (1st Cir.1973). *Correale* was an unusual case where neither specific performance of the plea agreement nor allowing the defendant to withdraw his plea truly would have been adequate remedies. The defendant in *Correale* was serving a state sentence at the time that he entered into a plea agreement with federal prosecutors to resolve pending federal charges. The prosecution promised to recommend a sentence which would effectively make the defendant parole-eligible on his federal sentence at the same time that he would become

eligible for parole on his state sentence. At sentencing, the government made the promised sentence recommendation for a concurrent sentence. However, the government's recommendation was for a sentence that was not authorized under federal law and the defendant received a longer sentence. Accordingly, the appellate court molded a remedy to fit the situation and ordered that the defendant be released on a probationary sentence to be put in a position as close as possible to that originally promised by the government.

In *Santobello* the Supreme Court suggested that specific performance of a lenient sentence recommendation entitles the defendant to sentencing before a judge not exposed to the prosecution's more harsh recommendation made in breach of the agreement. The *Santobello* Court acknowledged that the sentencing judge had stated that he was not influenced by the prosecution's recommendation. Nonetheless, the Supreme Court reversed and remanded with instructions that the state court decide whether to allow the defendant to withdraw his plea or instead order specific performance. Notably, the Supreme Court described specific performance as including resentencing "by a different judge." *Santobello*, 404 U.S. at 263, 92 S.Ct. at 499.

Picking up the Supreme Court's instruction in *Santobello*, lower courts have ordered that specific performance of sentencing agreements be carried out with a second sentencing before a different judge when faced with a prosecutor's initial breach of an agreement for a sentencing recommendation. For example, the Supreme Court of Montana upheld an order for resentencing before an "untainted" judge in which the prosecution was directed to "stick with plea agreement." *State v. Persak*, 256 Mont. 404, 847 P.2d 280, 282 (1993) (quotations omitted). Similarly, the Court of Appeals of Oregon held that, where a prosecutor made a sentence recommendation other than that promised, it was necessary to vacate the sentencing and remand for a second sentencing "by a different circuit judge following a recommendation by the prosecutor which is consistent with the plea agreement." *Stone v. Cupp*, 39 Or.App. 473, 592 P.2d 1044, 1046 (1979). The court in *Stone* felt this was necessary even though "the trial court was not influenced by the recommendation" because that "factor is immaterial under *Santobello*." *Id.* 592 P.2d at 1045 n. 1.

■ This case is different from *Santobello*, *Stone* and *Persak* in that the breach of the plea agreement in this case was discovered before sentencing took place. *Santobello* discussed specific performance as including resentencing by a different judge, but in *Santobello* the original judge had already imposed a sentence, having heard only the impermissible recommendation. This was also the case in *Stone* and *Persak*, two cases where no court had held that the prosecution was in violation of the plea agreements until after the sentences had already been imposed. These cases did not address the question of the appropriate remedy when the breach of a sentencing agreement is discovered before sentencing, when the sentencing judge has an opportunity to take adequate remedial action. *Santobello* explicitly left to the state courts selection of the appropriate remedy for breach of a plea agreement. Resentencing should not be necessary if the breach is discovered before sentencing and an appropriate cure is adopted by the judge. Along this line, the fact that the sentencing judge is exposed to a sentencing recommendation that breaches a plea agreement should not in and of itself require transfer of the case to another judge if the breach is recognized and appropriate remedial action taken. The question presented in this case is whether adequate remedial action was taken to allow the sentence to stand.

## III.

## INTRODUCTION OF EVIDENCE IN AGGRAVATION BY THE STATE

■ The sentencing judge correctly concluded that the fact that the state was barred from requesting the death penalty did not foreclose the court's own ability to consider imposition of a death sentence.[4] However, in allowing the state to put on evidence in aggravation, the district court effectively allowed the prosecution to advocate a position

4. The state relies on *State v. Robbins*, 123 Idaho 527, 850 P.2d 176 (1993), and suggests that under *Robbins* there could be no vindictiveness *by the court* in this case because the sentence Lankford received at resentencing was less severe than that initially imposed. However, as the district court understood and fully discussed, Lankford alleged *prosecutorial* vindictiveness of the type condemned in cases such as *State ex rel. Patterson v. Randall*, 637 S.W.2d 16 (Mo.1982) (en banc) (where state did not initially seek death

inconsistent with its promise to recommend an indeterminate life sentence, the most lenient sentence possible for a conviction of First Degree Murder. *Cf. State v. Little,* 138 N.H. 657, 645 A.2d 665, 669–70 (1994) (prosecutor did not breach plea agreement for sentence recommendation by making agreed recommendation and also presenting evidence in aggravation because the judge possibly could have imposed a more lenient sentence than that suggested by the prosecution).

In addition to aggressively cross-examining the defense witnesses testifying in mitigation, the state presented the following evidence in aggravation: (1) testimony that Lankford had been a disruptive inmate while incarcerated on death row; (2) testimony by an expert witness that, based on psychological examinations of Lankford, he was a poor candidate for rehabilitation; and (3) testimony that one of the victims, Captain Bravence, was a combat-trained marine who could not have been subdued by Mark Lankford without Bryan Lankford's assistance due to Captain Bravence's knowledge of self-defense which would be contrary to Bryan Lankford's version of events.

In addition to the evidence itself the state made the following arguments based on the evidence: (1) that Lankford willingly participated in the murders and was not dominated by his older brother; (2) that Lankford was highly culpable because he had "forged the Bravences' names to travelers' checks and credit card slips;" (3) that Lankford was highly culpable because he made the arrangements for the two brothers to stay with a friend in Los Angeles after the murders; (4) that Lankford was "manipulative," "dishonest," and "dangerous;" (5) that the witnesses who testified on Lankford's behalf in mitigation were not credible; and (6) that the defense's expert witness' testimony about Lankford's psychological condition was unreliable. The state specifically argued in rebuttal against giving Lankford "the most lenient treatment," despite the fact that the court had earlier ruled the state was obligated to recommend an indeterminate life sentence, the most lenient sentence available for the crimes for which Lankford had been convicted.

At the outset of the resentencing proceeding, the district court instructed the prosecution that it had to walk a "fine line" in presenting evidence in aggravation while at the same time still bound to the original recommendation for an indeterminate life sentence. A review of the evidence and arguments indicates that the fine line was crossed many times. Allowing the state to make the arguments and introduce the evidence in aggravation to the extent that was done was reversible error, because it was so fundamentally at odds with the position the state was obligated to recommend that it amounted to a violation of the agreement. In this case the state was bound to a plea agreement for the minimum sentence that could be imposed. The evidence and arguments submitted by the state clearly called for a greater sentence.

Lankford's suggestion that no evidence in aggravation could be introduced is more of a remedy than he is entitled to receive. The district court could exercise its powers under I.C.R. 32(f) to order additional investigation on the question of evidence in aggravation. The court could have required the prosecution to issue subpoenas, or issued subpoenas of its own and then questioned the witnesses. *See* I.R.E. 614. This would have allowed the court to consider the evidence for purposes of analyzing the statutory aggravating circumstances without involving the prosecution in the presentation of evidence in contravention of the plea agreement and the prohibition against vindictive prosecution. The sentences imposed are vacated and the case is remanded for resentencing with orders that the district court employ a procedure that does not involve the prosecution in the pre-

penalty, due process prevents state from seeking it after defendant's successful appeal and change of prosecutor).

sentation of evidence in aggravation.[5]

The remaining question is whether the sentencing judge should remain the sentencing judge on remand. So there can be no suggestion that the sentence ultimately imposed on remand, whatever it may be, is in any way a product of the residual effects of the state's submission of aggravating evidence and arguments, resentencing shall be by a judge who has not heard the evidence or arguments.

## IV.

## THIS COURT HAS ALREADY RULED THAT THE IMMUNITY AGREEMENT DID NOT PROVIDE LANKFORD WITH IMMUNITY FOR THE MURDERS

■ As he has argued before this Court previously, Lankford contends that he was granted transactional immunity for all matters included in his testimony against Mark Lankford, including the murder of the Bravences. According to Lankford, the grant of transactional immunity prohibited any punishment for matters included within his testimony and barred the district court from imposing sentence. Despite Lankford's insistence that this claim was previously decided wrongly, it was nevertheless decided that:

> [t]he district court did not err when it found that the immunity agreement (Defendant's Exhibit # 1) between the state and Lankford did not immunize Lankford from sentencing for the crimes for which he had already been convicted when the agreement was entered into.... Instead of providing retroactive protection, the immunity agreement was prospective in effect and protected Lankford from any other charges that might have been brought pursuant to his use of the Bravences' property.

*State v. Lankford,* 113 Idaho 688, 695–96, 747 P.2d 710, 717–18 (1987).

■ Lankford contends that res judicata is not a bar to re-litigation of the issue relying on *Aragon v. State,* 114 Idaho 758, 760 P.2d 1174 (1988). However, the very narrow exceptions to res judicata described in *Aragon* were for instances of ineffective assistance of counsel, newly discovered evidence, or changes in the controlling law. *Id.* at 766 n. 12, 760 P.2d at 1182 n. 12. None of those circumstances exists here.

Lankford's original brief filed in 1986, made substantially the same arguments when the claim was first presented to the Court. Lankford's suggestion that the Court overlooked his argument that the immunity agreement was transactional is not correct. The Court agreed that it was an agreement for transactional immunity but simply disagreed with Lankford about what transactions were covered. The Court will not revisit this claim.

## V.

## THE DISTRICT COURT CORRECTLY DENIED LANKFORD'S MOTION FOR RECUSAL

■ The issue concerning Lankford's motion to recuse the sentencing judge is moot in light of the fact that sentencing will take place before a different judge. However, the court will address the question briefly to settle matters in the record.

The sentencing judge took a guided tour of death row. Initially, the defense had no objection based on this disclosure and even discussed having the judge briefly occupy a cell in order to better understand the type of confinement Lankford had experienced. Yet when the court reconvened after the weekend, the defense had filed a recusal motion based on the judge's prison tour.

---

5. Of course, the resentencing will entail only a choice between a fixed or an indeterminate life sentence. This Court has previously held that once a life sentence has been imposed, as in this case, double jeopardy bars imposition of the death sentence should resentencing occur after a successful appeal. *See State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (1985) (citing *Arizona v. Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)).

On the tour the sentencing judge spoke briefly to Sgt. Taylor, a witness who had testified for the prosecution about Lankford's behavior in prison.[6] Sergeant Taylor was on duty in the death row unit but did not accompany the tour group. There was no discussion of the case.

Lankford relies on cases from other jurisdictions involving ex parte contacts in sentencing procedures where the substance of the contact was, or could have been, relevant to the sentencing determination. By contrast, Lankford's claim is that even though nothing of substantive relevance was discussed by the trial judge and Sgt. Taylor, the contact could nevertheless have potentially impacted the sentencing procedure because the sentencing judge's assessment of Sgt. Taylor's credibility might have been affected. Lankford cites to no decision where such an attenuated impact on the sentencing procedure has been condemned as an impermissible ex parte contact, and this Court has discovered none.

In *State v. Pratt*, 125 Idaho 546, 873 P.2d 800 (1993), the defendant sought to disqualify the judge in post-conviction proceedings based on the fact that the judge and the prosecutor had communicated about some administrative matters not involving the merits of the case. This Court affirmed the trial court's denial of the motion based on the defendant's inability to demonstrate any prejudice resulting from the communications and the judge's representation that the merits of the case had not been discussed. *Id.* at 566, 873 P.2d at 820.

While *Pratt* involved contact with a prosecutor rather than a prosecution witness, the interaction was as innocuous as what occurred in this case. Lankford's suggestion that any interaction between two people necessarily contributes to an assessment of credibility is simply too broad. There is no evidence in the record indicating that the sentencing judge received the type of informa-

tion from Sgt. Taylor during the prison tour which one would expect a person to rely upon in formulating a credibility determination. Lankford's claim lacks support in fact and runs contrary to common experience. The denial of the motion to recuse is affirmed.

## VI.

## REVIEW OF THE SENTENCES IS MOOT

Although Lankford appeals the sentences imposed as an abuse of discretion, review of the sentences imposed has been rendered moot by our rulings, and we explicitly decline to express any opinion on the sentences which might impact the decision on remand.

## VII.

## CONCLUSION

The sentences imposed by the district court are vacated. We remand for resentencing in which the prosecution is obligated to make its initial recommendation for an indeterminate life sentence and is not allowed to present evidence in aggravation. Resentencing shall be conducted by a district judge who has not been exposed to the state's impermissible presentation of evidence in aggravation.

McDEVITT, C.J., JOHNSON and SILAK, JJ., concur.

TROUT, Justice, concurring in all but Part III; To Part III, concur in part and dissent in part.

I write only to indicate my dissent from that portion of the opinion which remands this case for sentencing before another district judge. While Judge Schilling may have been exposed to information in aggravation which he would not otherwise have heard, I do not believe that it necessitates removing

---

6. Sgt. Taylor testified on April 5, 1993. On April 12, 1993, Judge Schilling stated that the tour had taken place the "day before yesterday."

him from any further consideration of this case. We presume that judges are able to exclude from consideration any improper or inadmissible evidence. "That judges are capable of disregarding that which should be disregarded is a well accepted precept in our judicial system." *Sivak v. State*, 112 Idaho 197, 205, 731 P.2d 192, 200 (1986) (citations omitted). Whether a judge's involvement in a case reaches a point where disqualification from further participation becomes necessary is left to the sound discretion of the trial judge himself. *Id.* at 207, 731 P.2d at 201. I see no reason to deviate from that principle in this instance.