# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47522

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Moscow, April 2023 Term |
| | ) | |
| v. | ) | Opinion filed: July 12, 2023 |
| | ) | |
| MARK HENRY LANKFORD, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Idaho County. Jay P. Gaskill, District Judge.

The judgment of the district court is <u>affirmed</u>.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Appellant. Garth McCarty argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. L. LaMont Anderson argued.

_____

MOELLER, Justice.

This is Mark Henry Lankford's third appeal from his convictions for the first-degree murders of Robert and Cheryl Bravence near Grangeville, Idaho, in 1983. Errors in Lankford's first two trials in 1984 and 2008 resulted in those convictions being vacated. Lankford was retried in 2019 and was again convicted of first-degree murder. Lankford now appeals his third conviction, assigning error on the following grounds: (1) that the district court abused its discretion when it allowed the State to question Lankford's brother about statements Lankford made on a late-disclosed prison phone recording; (2) that the evidence was insufficient to support his conviction when the "law of the case doctrine" is applied to his case; and (3) that the district court erred in denying Lankford's motion to dismiss for a speedy trial violation. For the reasons stated below, we affirm Lankford's convictions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

1

In October 1983, Mark Henry Lankford (hereinafter "Lankford" or "Mark Lankford") and his brother, Bryan Stuart Lankford, were arrested for the murders of Robert and Cheryl Bravence, which occurred at a campground in the woods near Grangeville, Idaho. As we detailed in *Mark Lankford I*, "The Lankfords were . . . tried separately for the murders of Robert and Cheryl Bravence. Bryan Lankford agreed to be a witness for the State at his brother's trial because he believed the State had offered him an indeterminate life sentence instead of the death penalty in exchange for his testimony." *State v. Mark Henry Lankford*, 116 Idaho 860, 864, 781 P.2d 197, 201 (1989) (*Mark Lankford I*). At Mark Lankford's first trial, Bryan Lankford[1] testified to Mark Lankford's involvement in the murders. We summarized Bryan Lankford's testimony in *Mark Lankford I* as follows:

> Bryan testified as follows: After reaching the Idaho County forest where they hid out, Mark and Bryan decided to steal an automobile from a campsite in the area. They reasoned that, because the monthly payments on Mark's car [a 1982 Chevrolet Camaro] were delinquent, the police would be searching for it and so they needed to abandon it to avoid capture. They left the car in the woods covered with brush and set off to steal another car. They walked down a mountain road which eventually led to a campsite occupied by Robert Bravence and his wife Cheryl. Bryan entered the campsite first, with a shotgun draped over his arms, and engaged the Bravences in conversation. Shortly thereafter Mrs. Bravence left the campsite to go down to a nearby stream for some water. After Mrs. Bravence left, Mark Lankford ran out from behind some bushes where he had been hiding, and into the campsite and ordered Robert Bravence to kneel on the ground in front of him. Mark Lankford then hit Robert Bravence in the back of the head with a brown wooden night stick. When Cheryl Bravence returned to the campsite she rushed to the side of her husband who was lying on the ground. Mark Lankford ordered her to kneel down on the ground next to the body of her husband and struck her in the back of the neck with the same nightstick. The Lankfords placed the Bravences' bodies into the Bravence van and drove back to their former campsite where Mark hid the bodies near his Camaro. The Lankfords then drove the Bravence van to Oregon and later to California where they abandoned it in Los Angeles. During their travels they purchased food and accommodations with the Bravences' credit card.

---

[1] Bryan Lankford was convicted and originally sentenced to death in his first trial, before the United States Supreme Court later vacated his death sentence, *Bryan Lankford v. Idaho*, 500 U.S. 110 (1991) (5-4 decision). Bryan Lankford's case was remanded to this Court, *Id.* at 128, where we remanded to the district court for resentencing. *State v. Bryan Lankford*, 127 Idaho 608, 612, 903 P.2d 1305, 1309 (1995). Bryan Lankford was then resentenced to two consecutive fixed life terms. *State v. Bryan Stuart Lankford*, 127 Idaho 608, 903 P.2d 1305 (1995). Bryan Lankford appealed to this Court, which vacated the second sentence and remanded "for resentencing in which the prosecution [was] obligated to make its initial recommendation for an indeterminate life sentence and is not allowed to present evidence in aggravation." *Bryan Stuart Lankford*, 127 Idaho at 619, 903 P.2d at 1316.

*Mark Lankford I*, 116 Idaho at 864, 781 P.2d at 201. At the conclusion of his separate trial, the jury found Mark Lankford guilty of two counts of first-degree murder for the killings of Robert and Cheryl Bravence. He was later sentenced to death. Mark Lankford initially appealed to this Court in 1989, where we affirmed his judgment of conviction and his sentence of death. *Mark Lankford I*, 116 Idaho at 878, 781 P.2d at 215.

In April 1992, "Lankford filed another petition for post-conviction relief under I.C. § 19–2719, seeking a new trial or resentencing." *Mark Lankford v. State*, 127 Idaho 100, 897 P.2d 991 (1995) (hereinafter "*Mark Lankford II*"). This Court denied his appeal after determining that "Lankford . . . failed to assert any claim not barred by I.C. § 19–2719." *Mark Lankford II*, 127 Idaho at 102, 897 P.2d at 993.

Lankford's post-conviction proceedings continued through the federal courts. "Mark [Lankford] pursued his state appeals, post-conviction relief, and state habeas relief, then (after several false starts) he filed a federal habeas petition." *Mark Lankford v. Arave*, 468 F.3d 578, 582 (9th Cir. 2006). In his federal habeas petition, the United States District Court for the District of Idaho determined an erroneous jury instruction had been given and found that his trial counsel had been ineffective, but "the court ultimately denied the petition, finding there was no prejudice." *Id.* at 583. However, on appeal to the Ninth Circuit, it reversed the district court, concluding there was prejudice:

> Bryan's testimony about the murder weapon, the number of blows, and the force of those blows was vague, contradictory, and when considered in light of the Bravences' fragmented skulls not persuasive. It is this precise scenario an accomplice who must implicate the defendant in order to hide his own culpability that Idaho's corroboration requirement addresses. We agree with the district court that FitzMaurice's requested jury instructions were simply wrong under Idaho law. The corrupted instruction was not corrected by other instructions. Although the question is close, we disagree with the district court as to the prejudicial effect of the error. There was ample evidence that either one or both of the Lankfords killed the Bravences, *but there was no evidence that Mark attacked and killed the Bravences other than Bryan's testimony*, and there was strong evidence raised at the habeas proceedings suggesting that Bryan's testimony is inconsistent with the forensic evidence. Counsel's request that the jury be instructed that it could convict on the basis of Bryan's testimony alone was plainly prejudicial.

*Id.* at 591 (emphasis added). Accordingly, the judgment of the federal district court was reversed, and the case was remanded "with instructions to grant the petition for a writ of habeas corpus, with

3

appropriate instructions to retry Mark Lankford within a reasonable time or release him." *Id.* at 592.

"A new trial was held in 2008, and on February 13, 2008, a jury again found Lankford guilty of both murders. Lankford then filed a motion for a new trial. In July 2008, Lankford was sentenced to two consecutive fixed life sentences, which he timely appealed." *State v. Mark Henry Lankford*, 162 Idaho 477, 484, 399 P.3d 804, 811 (2017) (3-2 decision) (hereinafter "*Mark Lankford III*").[2] That appeal was suspended until the motion for a new trial was resolved in district court. *Id.* In October 2009, the district court denied the motion for a new trial. Later that same month, Lankford filed a second motion for a new trial, which was denied in December 2013. *Id.* Lankford then appealed the denial of both motions to this Court. *Id.* This Court released its original decision in July 2016, but subsequently granted the State's petition for rehearing. *Id.*

On rehearing, this Court concluded "that there is a 'reasonable likelihood' that [a witness's] false testimony about his motive for testifying '*could* have affected the judgment of the jury.' " 162 Idaho at 507, 399 P.3d at 834 (emphasis added). This Court further concluded that "[t]he prosecutor's failure to disclose the full details of the agreement 'undermines our confidence in the outcome of the trial,' such that we cannot be sure the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Ultimately, this Court held "that Lankford's right to a fair trial was violated and that he [was] entitled to a new trial." *Id.* Accordingly, Lankford's 2008 conviction was vacated, and the case was again remanded to the district court.

In 2019, Lankford was again retried and convicted of the murders of Robert and Cheryl Bravence. This was Lankford's third conviction for the Bravences' murders. He was once again sentenced to two consecutive fixed life sentences without the possibility of parole. Lankford timely appealed. On appeal, Lankford argues: (1) that the district court abused its discretion when it allowed the State to question Lankford's brother about statements Lankford made on a late-disclosed prison phone recording; (2) that the evidence is insufficient to support his conviction when the law of the case doctrine is applied to his case; and (3) that the district court erred in

---

[2] In its briefing, the State denominates *State v. Lankford*, 162 Idaho 477, 484, 399 P.3d 804, 811 (2017), as "*Lankford III*." However, given the numerous appeals of both Mark and Bryan Lankford, "*Mark Lankford III*" is used to refer to Mark Lankford's 2017 appeal to eliminate any confusion between the brothers' appeals.

denying Lankford's motion to dismiss for a speedy trial violation. For the reasons stated below, we affirm Lankford's convictions.

## II. STANDARD OF REVIEW

"Whether evidence is relevant is a question of law and is subject to de novo review." *State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022). However, this Court reviews a trial court's decision whether to admit or exclude evidence under the abuse of discretion standard. *State v. Korn*, 148 Idaho 413, 416, 224 P.3d 480, 483 (2009) (citing *Dachlet v. State*, 136 Idaho 752, 755, 40 P.3d 110, 113 (2002)); *State v. Ogden*, 171 Idaho 258, 266, 519 P.3d 1198, 1206 (2022) ("The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion.") (quoting *State v. Hall*, 163 Idaho 744, 781, 419 P.3d 1042, 1079 (2018)).

Under that abuse of discretion standard, this Court reviews four elements to determine "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Villa-Guzman*, 166 Idaho 382, 384, 458 P.3d 960, 962 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

In regard to a motion for acquittal, as this Court noted in *State v. Adamcik*, "[t]he Fourteenth Amendment of the United States Constitution guarantees the right to due process, and the U.S. Supreme Court has held that as a part of that due process, 'no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.' " 152 Idaho 445, 460, 272 P.3d 417, 432 (2012) (citing *Jackson v. Virginia,* 443 U.S. 307, 316 (1979)). Importantly, "[t]he relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (citing *Jackson,* 443 U.S. at 319) (emphasis in original). Thus, in review of a motion for acquittal, "the only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements of first-degree murder beyond a reasonable doubt." *Id.* (citing *State v. Joslin*, 145 Idaho 75, 80, 175 P.3d 764, 769 (2007)); *State v. Goggin*,

157 Idaho 1, 4, 333 P.3d 112, 115 (2014) ("The Court reviews a trial court's ruling on a motion for acquittal for substantial evidence.").

Regarding Lankford's constitutional challenge, "[c]onstitutional issues and the construction and application of legislative acts are pure questions of law over which this Court exercises free review." *Hall v. State*, 155 Idaho 610, 615, 315 P.3d 798, 803 (2013) (quoting *State v. Statton,* 136 Idaho 135, 136, 30 P.3d 290, 291 (2001)).

## III. ANALYSIS

Lankford asserts three discrete points of error. First, he argues that the district court abused its discretion under Idaho Rule of Evidence Rule 403 when it ruled on an objection related to a prison telephone conversation between his two brothers, Lee John Lankford and Bryan Lankford. Second, he argues that under the "law of the case doctrine," this Court's decision in *Mark Lankford III,* coupled with the lack of testimony from Lane Thomas, a key witness in *Mark Lankford II*, establishes that the evidence is insufficient to support Lankford's conviction. Third, Lankford argues that the district court erred in denying Lankford's motion to dismiss for a speedy trial violation. We will address each point in turn.

### A. The district court did not err in its decision regarding the late-disclosed telephone calls.

Initially, it is important to note that this case concerns a *late* disclosure of evidence, rather than a *nondisclosure*. While a nondisclosure concerns evidence the defense has not been shown, a late disclosure is just that, late. It is evidence disclosed later than required by the trial court or the relevant rules. While both late disclosure and nondisclosure run afoul of the disclosure requirement and can be subject to discovery sanctions, nondisclosure also implicates a defendant's constitutional right to exculpatory information. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959). While Lankford's brief mentions a "nondisclosure" argument raised by the defense below, his arguments, authorities cited, and section headings all reference a "late disclosure."[3] Accordingly, based on the record, and in the absence of argument to the contrary, we will evaluate Lankford's argument as based solely on the late-disclosed evidence. As to the inquiry concerning the general admissibility of late-disclosed evidence, this Court has said that "[w]here the question is one of late disclosure rather than failure to disclose, the inquiry

---

[3] In the two instances where Lankford uses the term "nondisclosure" in his argument, the surrounding language and context reference late disclosure.

on appeal is whether the lateness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *State v. Byington*, 132 Idaho 589, 592, 977 P.2d 203, 206 (1999) (citing *State v. Olsen,* 103 Idaho 278, 283, 647 P.2d 734, 739 (1982)). Thus, "[t]o prove prejudice, a defendant must show there is a reasonable probability that, but for the late disclosure of evidence, the result of the proceedings would have been different." *State v. Tapia*, 127 Idaho 249, 255, 899 P.2d 959, 965 (1995) (citing *State v. Spradlin,* 119 Idaho 1030, 1034, 812 P.2d 744, 748 (Ct.App.1991)).

Here, the evidence was disclosed by the State after the trial had commenced, during the State's case-in-chief. Therefore, the essential inquiry is whether the lateness of the disclosure so prejudiced Lankford's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial. For Lankford to prove prejudice, he must show there is a reasonable probability that but for the late disclosure his trial result would have been different.

The evidence in question consisted of recordings from three telephone calls made from prison by Bryan Lankford—two with a male (Lee John Lankford (Mark and Bryan's brother)) and one call with a female. While the recordings themselves are not in the record, the discussions surrounding the recordings below suggest that the recordings illustrate a motive for Bryan to lie. The district court determined that there was no coordinated communication to fabricate testimony shown on the recordings. However, the district court recognized that there were "a lot of integrated statements,"—i.e., admissible statements intertwined with inadmissible statements—that made the phone calls problematic. The court was primarily concerned with references on the calls to Lankford being incarcerated. Thus, the district court ruled that admitting the recordings would be unfairly prejudicial under Rule 403 despite their relevance.

After the district court disallowed the admission of the recordings, the State sought clarification of the district court's ruling. The prosecutor first informed the district court of his intention: "Judge, in light of the Court's ruling, the State does intend to re-call Bryan Lankford regardless and, specifically, without admitting the tapes, talk to him about the statements he made." The district court agreed. Later, just before Bryan Lankford was to testify, counsel for Lankford argued that the recordings were inadmissible and raised concern about how far the State might inquire. The prosecutor explained his understanding of the district court's ruling: "my understanding of the Court's ruling is that, [the] ruling excluded, the extrinsic evidence, the tapes

7

of his statements, I fully intend on asking him about the statements, as is my right." The district court agreed.

Later, when Bryan Lankford took the witness stand, the district court reminded Bryan Lankford about the district court's order "regarding not talking about convictions or sentencings or being in prison[.]" The State then briefly questioned Bryan about his prior inconsistent statements on the recordings indicating that he intended to lie to get Lankford acquitted and, perhaps, get himself out of prison. Bryan then had the opportunity to explain or deny the statements, which he took—explaining some statements and denying others. For example, the prosecutor asked Bryan: "you believe that the only way you can get out of prison, is if you assist in acquitting your brother, Mark Lankford, correct?" Bryan responded: "That's stupidity." The prosecutor then asked Bryan: "You believe that, if [Mark Lankford] is acquitted, you will have to be let out of prison, correct?" Bryan denied such a belief. The prosecutor similarly inquired, "[i]f Mark is acquitted, he'll be able to help you get out of prison, correct?" After an overruled objection, Bryan stated, "I don't know how. You got any ideas?" Additionally, the prosecutor asked if Bryan had made a statement that he was going to "blow them [the State] out of the water at [Lankford's] trial, correct?" Bryan answered, "I have no idea." The State's direct examination of Bryan ended as follows:

> Q: [Prosecutor] You also said, I'm going to do everything I can to make sure he's acquitted, correct?
>
> A: [Bryan Lankford] Sounds like something I would say. He should be acquitted. He's innocent.
>
> Q: So in your own words, you're willing to do anything at this point to help your brother get acquitted?
>
> A: No, not anything.
>
> Q: And that would include taking sole responsible [sic] for two murders, correct?
>
> A: No. I did it. End of story.

It must be stressed that the recordings the prosecutor alluded to were not admitted into evidence. Instead, the district court allowed the State to generally inquire into the prior inconsistent statements for impeachment purposes. But when questioned about his prior statements, Bryan denied some and acknowledged another with the explanation that, although he knew his brother to be innocent, he would not do "anything" to get him acquitted. When viewed in the full context of the trial, this cannot be said to be unfairly prejudicial—if prejudicial at all—and we conclude that

8

the district court did not abuse its discretion. The district court recognized that the tapes concerned integrated statements that referenced Lankford's incarceration. Accordingly, the district court did not allow the tapes to be admitted. Instead, the district court only allowed a general inquiry into the prior inconsistent statements. The colloquy between the State and Bryan Lankford did not reference Lankford's incarceration—the prejudicial effect cited by the district court when it excluded the recordings. Thus, the district court denied the admission of the *recordings* under 403 but permitted inquiry into *some statements without referencing incarceration*. Importantly, the State made no further attempt to offer the recordings for impeachment.

Although not referenced by the district court in the colloquy with counsel prior to Bryan Lankford's redirect examination, the use of a recorded conversation for impeachment purposes is permitted under Rule 613 of the Idaho Rules of Evidence. This rule provides:

> **(a) Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.

> **(b) Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires.

I.R.E. 613. Just because the court barred the extrinsic evidence from being directly admitted pursuant to Rule 403 does not mean that the evidence was also prohibited for the separate purpose of impeachment. Under Rule 613, a witness may be questioned about prior inconsistent statements without requiring the prior statement to be introduced as extrinsic evidence. Further, the State is permitted to impeach its own witness under Rule 607.

Since the inquiry of Bryan Lankford at issue was proper, there remains the question of the late disclosure. The primary focus is on whether the *lateness* of the disclosure itself prejudiced the preparation or presentation of the defense to such a degree that the "result of the proceedings would have been different." *Tapia*, 127 Idaho at 255, 899 P.2d at 965. Here, the late disclosure came during the State's case in chief, as potential evidence to impeach the testimony *of its own witness*. And, as mentioned above, the Idaho Rules of Evidence permit the State to impeach its own witnesses. I.R.E. 607. While the evidence was not beneficial to Lankford, it cannot be said that the lateness of the disclosure prejudiced Lankford's preparation or presentation. In fact, Lankford's position, both below and on appeal, was that this evidence was merely *cumulative*.

Again, it is important to note that this late-disclosed evidence was never actually admitted. It was only generally referenced by the prosecution and never entered into the record. When Bryan denied making certain statements, no effort was made under Rule 613(b) to impeach his testimony with extrinsic evidence of the telephone calls. Inasmuch as the recordings were not introduced, this diminishes any inference that the lateness of the disclosure prejudiced Lankford. In fact, given Bryan's responses, Lankford has failed to show that there is a reasonable probability that, but for the *late disclosure* of this evidence, the result of the proceedings would have been different. Accordingly, the district court's decision related to the late-disclosed evidence is affirmed.

Lankford also argues that the district court erred in denying his Rule 403 objection. Lankford specifically faults the district court for failing to exercise reason in disallowing the actual recording but permitting the subject matter of the recorded conversation to be inquired into by the State on direct examination. We disagree.

Idaho Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We review the district court's I.R.E. 403 decision for an abuse of discretion. *State v. Ogden*, 171 Idaho 258, 519 P.3d 1198, 1213 (2022) (citing *State v. Garcia*, 166 Idaho 661, 671, 462 P.3d 1125, 1135 (2020)), *cert. denied*, 143 S. Ct. 1010 (2023).

Here, the district court excluded the recordings from being played for the jury. The district court recognized that there were references on the call to Lankford being incarcerated, which it found problematic. Thus, the district court concluded that admitting the recordings into evidence would be unfairly prejudicial despite their relevance. Consistent with this concern of unfair prejudice, just before Bryan Lankford testified on redirect, the district court cautioned Bryan Lankford that he could mention "nothing about Mark Lankford being in prison or convicted, or anything like that . . . ."

Taken together, we conclude that the district court reached its decisions through the exercise of reason and did not otherwise abuse its discretion. It recognized that the recordings concerned integrated statements that referenced Lankford's incarceration and, accordingly, did not allow the recordings to be admitted. Instead, the district court only allowed a general inquiry into the prior inconsistent statements. Importantly, the colloquy between the State and Bryan Lankford did not reference Lankford's incarceration—a chief prejudicial concern cited by the district court

10

when it excluded the tapes. Thus, the district court denied the direct admission of the *recordings* under 403 but permitted inquiry into *some statements not referencing incarceration for impeachment purposes*. This is permissible under Idaho Rule of Evidence 613. Denying the direct admission of evidence does not necessarily preclude its use for impeachment purposes when making an inquiry into a prior inconsistent statement under Idaho Rule of Evidence 613.

In *State v. Floyd*, the Idaho Court of Appeals observed that "Rule 403 does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to the party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." 125 Idaho 651, 654, 873 P.2d 905, 908 (Ct. App. 1994) (citing *Wade v. Haynes,* 663 F.2d 778, 783 (8th Cir.1981)). Frankly, it is uncertain whether the colloquy between the prosecutor and Bryan Lankford concerning his past statements was actually detrimental to Mark Lankford's chance at acquittal. But even if it were, it did not provide a foundation for the jury to make its decision on an improper basis. Accordingly, the district court did not err in allowing the State to question Bryan Lankford regarding his prior inconsistent statements.

**B. The law of the case doctrine does not apply because this Court's comments regarding the evidence from the 2008 trial expressed neither a principle nor a rule of law.**

Lankford challenges the sufficiency of the evidence supporting his conviction and argues that the district court abused its discretion in denying his motion for acquittal pursuant to Idaho Criminal Rule 29. Lankford's theory is layered and rests on a contorted application of the law of the case doctrine and the corroboration requirement of Idaho Code section 19-2117. Essentially, Lankford argues that since the State offered basically the "same evidence that was before this Court in the prior appeal[,] and no other witnesses testified that Mark had the intent to commit the robbery[,]" this Court's determination in *Mark Lankford III* that Lane Thomas' testimony was "essential" renders Lankford's conviction uncorroborated under Idaho Code section 19-2117. Thus, in Lankford's view, the district court was bound by the same legal conclusions about the importance of certain evidence made in this Court's prior opinion vacating a different trial, even though it was deciding issues in a different trial with a different evidentiary record. This is a misapplication of the law of the case doctrine.

As we have said, "[t]he law of the case doctrine is well settled in Idaho and is utilized to 'maintain consistency and avoid reconsideration of matters once decided during the course of a

11

single, continuing lawsuit. . . .' " *Eich v. Wilbur J. Eich & Henrietta C. Eich Revocable*, 169 Idaho 467, 497 P.3d 541, 547 (2021) (citing *Berrett v. Clark Cnty. Sch. Dist. No. 161*, 165 Idaho 913, 922, 454 P.3d 555, 564 (2019)). "The law of the case doctrine provides 'upon an appeal, the Supreme Court, in deciding a case presented[,] *states in its opinion a principle or rule of law necessary to the decision*, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal . . . .' " *State v. Dunlap*, 155 Idaho 345, 375, 313 P.3d 1, 31 (2013) (emphasis added) (citing *Stuart v. State,* 136 Idaho 490, 495, 36 P.3d 1278, 1283 (2001)). Importantly, it is not the ultimate legal conclusions that become the law of the case; rather, it is the principles or rules of law necessary to reach that conclusion that become the law of the case.

In *Mark Lankford III,* this Court found that Lane Thomas' trial testimony was of critical importance to Lankford's 2008 conviction. However, that conclusion was based on the overall evidence introduced at *that* trial. A statement that such evidence, which concerned impeachment evidence relating to the scope of benefits given to Thomas by the State for testifying against Lankford, was important testimony in that trial because its suppression by the State ran afoul of *Brady*[4] or *Napue.*[5] In Lankford's 2008 trial, Thomas's testimony was necessary to satisfy the corroboration requirement of Idaho Code section 19-2117. Without his testimony at *that trial*, we concluded there was "a 'reasonable likelihood' that Thomas' false testimony about his motive for testifying '*could* have affected the judgment of the jury.' " *Mark Lankford III*, 162 Idaho at 507, 399 P.3d at 834 (emphasis in original). However, this does not mean that Lankford cannot be convicted without the testimony of Lane Thomas.

In the trial we are now reviewing, there was different, if not wholly new evidence presented to the jury. As one notable example, Dr. Bruce Anderson, a forensic anthropologist, testified during the third trial that, based on a review of Cheryl Bravence's x-rays, she had possible defensive wounds on her hands. Moreover, x-rays showed that both victims had facial fractures consistent with a "narrow" weapon. Anderson opined that "a club, say like a night stick type club, [could] have caused a fracture like that." This evidence was important because it not only contradicts Bryan's testimony in this trial that he used a rock in killing both victims, but it also corroborates his testimony from an earlier trial where he testified that Mark had killed both victims with a

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).
[5] *Napue v. Illinois*, 360 U.S. 264 (1959).

nightstick. There was testimony in this trial that Mark Lankford carried a nightstick—including from Mark himself—and a nightstick was found among the items in the 1982 Camaro (registered in Mark Lankford's name) that the brothers concealed near the victim's bodies. Importantly, Dr. Anderson did not testify in either of Mark Lankford's previous trials.

As discussed above, the law of the case doctrine is applied when this Court "states in its opinion a principle or rule of law necessary to the decision. . . ." *Dunlap*, 155 Idaho at 375, 313 P.3d at 31. While our view of Lane Thomas' testimony, as it concerned Mark Lankford's second trial, was necessary to this Court's analysis in our earlier opinion, that does not make it a principle or rule of law binding in the next trial. This is especially true where the evidence and trial strategies were not identical. Thus, we hold that the law of the case doctrine does not apply to the statement in *Mark Lankford III* indicating the importance of Lane Thomas' testimony to that trial because it was neither a principle nor rule of law.

## C. Lankford's speedy trial rights were not violated.

In Idaho, a defendant's right to a speedy trial is guaranteed by the federal and state constitutions and Idaho Code section 19-3501. On appeal, counsel for Lankford acknowledges that when moving to dismiss below, counsel conceded that the statutory protections of Idaho Code section 19-3501 did not apply under this Court's precedent in *State v. Avelar*, 129 Idaho 700, 931 P.2d 1218 (1997), which held that the statutory speedy trial protections do not apply to defendants following a successful appeal. Regarding the constitutional protections, Lankford does not specify whether his asserted error on appeal is grounded in the Idaho Constitution or the United States Constitution. Instead, Lankford simply argues a constitutional speedy trial violation using the four-factor analysis from *Barker v. Wingo*, 407 U.S. 514 (1972).

As an initial matter, the State notes a procedural defect with Lankford's appeal. The State asserts that since Lankford has offered no authority regarding the discrete question of whether the constitutional right to a speedy trial reattaches after a successful appeal, he has waived the issue. The Idaho Appellate Rules provide that an appellant's argument "shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon." I.A.R. 35(a)(6). Further, this Court has indicated that it "will not search the record on appeal for error." *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (citing *Suits v. Idaho Bd. of Prof'l Discipline,* 138 Idaho 397, 400, 64 P.3d 323, 326 (2003)). In *Bach v. Bagley*, this Court held that "[a] general

attack on the findings and conclusions of the district court, without specific reference to evidentiary or legal errors, is insufficient to preserve an issue." 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (citing *Michael v. Zehm,* 74 Idaho 442, 445, 263 P.2d 990, 993 (1953)).

We conclude that Lankford's presentation of the speedy trial violation issue was not a "general attack." Lankford presents his constitutional challenge with citation to relevant Supreme Court authority and precedents of this Court. Further, Lankford's challenge is supported by a clear argument. Lankford did not fail "to assert his assignments of error with particularity and to support his position with sufficient authority . . . ." *Id.* (citing *Randall v. Ganz,* 96 Idaho 785, 788, 537 P.2d 65, 68 (1975)). Thus, his assignments of error are not "too indefinite to be heard by the Court." *Id.* (*citing Randall*, 96 Idaho at 788, 537 P.2d at 68). Further, Lankford's speedy trial assignment of error contains contentions and supportive reasoning with respect to the speedy trial violation issue on appeal, including citations to authority and the portions of the record he relies upon. Accordingly, we conclude Lankford's speedy trial constitutional challenge is procedurally proper under I.A.R. Rule 35 and not "too indefinite" for this Court's review under our precedents.

Regarding the merits of Lankford's speedy trial claim, both the state and federal speedy trial constitutional rights are analyzed under *Barker v. Wingo,* 407 U.S. 514 (1972). However, this Court has held that while the text is similar, "the right to a speedy trial under the Idaho Constitution is not identical to the right guaranteed by the United States Constitution." *State v. Hobson*, 99 Idaho 200, 201, 579 P.2d 697, 698 (1978). The key difference is when the speedy trial clock begins. "Under the Sixth Amendment, the period of delay is measured from the date there is 'a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge.' " *State v. Young*, 136 Idaho 113, 117, 29 P.3d 949, 953 (2001) (quoting *United States v. Marion,* 404 U.S. 307, 320 (1971)); *see Marion*, 404 U.S. at 321 ("[W]e decline to extend [the] reach of the amendment to the period prior to arrest."). However, "[u]nder the Idaho Constitution, the period of delay is measured from the date formal charges are filed or the defendant is arrested, whichever occurs first." *Young*, 136 Idaho at 117, 29 P.3d at 953 (citing *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1986)); *see also State v. Davis*, 141 Idaho 828, 837, 118 P.3d 160, 169 (Ct. App. 2005) ("[W]e apply the *stricter* [speedy trial] standard found in our state constitution.") (emphasis added). From there, both state and federal constitutional claims turn to the balancing test under *Barker*.

14

"[T]he 'balancing test' laid down in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is consistent with decisions of this Court stating that whether one has been deprived of his right to a speedy trial must be decided by reference to considerations in addition to the mere passage of time." *State v. Lindsay*, 96 Idaho 474, 475, 531 P.2d 236, 237 (1975) (citing *Hadlock v. State*, 93 Idaho 915, 478 P.2d 295 (1973) and *Ellenwood v. Cramer*, 75 Idaho 338, 272 P.2d 702 (1954)) (adopting the balancing test from *Barker* in determining whether a speedy trial violation occurred under the Idaho Constitution). Thus, the United States Constitution and the Idaho Constitution are both interpreted under *Barker*. In applying *Barker*, this Court balances four primary factors identified by the Supreme Court of the United States: "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) the prejudice to the defendant." *Clark*, 135 Idaho at 258, 16 P.3d at 934 (citing *Barker,* 407 U.S. at 530).

Although Lankford argues that his constitutional speedy trial rights were violated under *Barker*, he does not argue how the stricter time calculation of the Idaho standard strengthens his argument or otherwise impacts the result. Thus, it appears the federal constitutional right is all that is challenged by Lankford.

1. *The length of the delay*

While there are four factors in the *Barker* speedy trial analysis, the first serves as a threshold consideration in determining whether further inquiry is required. As the Supreme Court noted in *Barker*: "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530. The Court held that a constitutionally permissible delay depends on the complexity of the crime: "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531. Thus, the primary inquiry is whether the delay is "presumptively prejudicial" and warrants further inquiry of the other *Barker* factors. If the delay is presumptively prejudicial, then the other factors determine if the delay is constitutionally permissible—i.e., whether the delay is permissible for the type of crime charged given the reasons for the delay, the assertion of the right, and any prejudice to the defendant.

Our opinion in *Mark Lankford III* was filed on July 3, 2017. After the remittitur was filed, the opinion became final on July 27, 2017. Lankford's retrial commenced on September 3, 2019.

15

Thus, the length of delay here is 768 days, more than 25 months from the final opinion vacating Lankford's 2008 conviction until the commencement of Lankford's third trial.

We have previously determined that a seven-and-a-half-month interval between a mistrial declaration and a second trial was presumptively prejudicial: "A delay of this length [seven-and-one-half-months] is sufficient to trigger our inquiry into whether a defendant has been denied a speedy trial." *State v. Talmage*, 104 Idaho 249, 252, 658 P.2d 920, 923 (1983) (citing *State v. Holtslander*, 102 Idaho 306, 308–09, 629 P.2d 702, 704–05 (1981)); *see also State v. Lindsay*, 96 Idaho 474, 476, 531 P.2d 236, 238 (1975) ("[T]he intervening period was thus some fourteen months, long enough to 'trigger' our inquiry."); *State v. Campbell*, 104 Idaho 705, 708, 662 P.2d 1149, 1152 (Ct. App. 1983) (concluding that a twelve-month period was presumptively prejudicial).

Here, the delay between the remittitur and the commencement of a new trial was over two years. Lankford's third murder trial was undoubtedly a complex one—it centered on decades-old discovery and evidence, and it required the testimony of numerous fact witnesses and expert witnesses. Some of these witnesses had died or were incarcerated since his earlier trials, requiring attorneys for both sides to adjust the strategies used in the prior trials. Yet, considering the precedent of this Court, we hold that the over two-year delay for retrial was presumptively prejudicial; therefore, we conclude that the delay triggers further inquiry under the remaining *Barker* factors.

2. *The reasons for the delay*

Lankford characterizes the length of delay as excessive by noting he has "been in constant custody for nearly 35 years and ha[s] yet to receive a fair trial." However, as discussed above, this Court reviews the right to a speedy trial in the context of a retrial as the time between the final decision vacating judgment (the remittitur) and the new trial—and not the length of time from the initial arrest.[6]

---

[6] The Ninth Circuit rejected the approach that the whole period of arrest, when there is a trial, appeal, and subsequent retrial, is reviewed in the same speedy trial manner. *See United States v. Robles*, 563 F.2d 1308, 1309 (9th Cir. 1977) ("[The defendant] first argues on this appeal that the three-year delay from the date of the offense to his retrial (after his successful appeal) denies him his Sixth Amendment right to a speedy trial. This argument is without merit. Robles was afforded a speedy trial in August 1974, five months after the indictment was filed, which resulted in his conviction. That conviction was vacated by this Court for reasons not related to this appeal. What happened was that the defendant was afforded a speedy trial; his conviction was vacated on appeal; and he was retried and again convicted. These facts

When discussing the reason for this delay between trials in his brief on appeal, Mark acknowledges in his briefing that his own actions played a role in the delay:

> [Lankford] acknowledged that he filed a motion to recuse the prosecutor due to his misconduct in the 2008 trial on September 14, 2017, and that the prosecutor was informed of his intention to the [sic] file the motion prior to its filing. The district court granted that motion [on] November 21, 2017, but Mark asserted that the prosecutor did not take any action to find alternative counsel until December 8, 2017. Further, Mark pointed out that he asserted his speedy trial rights in his motion to recuse the prosecutor.

(Internal citations omitted). While Lankford concedes that his motion to recuse the prosecutor may have caused some delay, he also argues "that motion should not count against him. [He] is, of course, entitled to a fair trial as well as a speedy trial, and these motions were essential to guaranteeing him a fair trial."

The record demonstrates that during the two-year period between remittitur and retrial, the attorneys for both sides were not idle. Rather, there were a significant number of unusual procedural events during this span. As mentioned above, remittitur was filed on July 27, 2017, and Lankford was appointed new counsel on August 1. The State moved to quash the order appointing the Idaho Attorney General as special prosecutor and reappoint MacGregor. This was granted without objection from Lankford. Yet, a few weeks later, after the initial trial date was set for January 8, 2018, Lankford moved to recuse the newly re-appointed prosecutor, MacGregor, on September 14, 2017. After a hearing, the district court took this motion under advisement on October 23, 2017. Subsequently, Lankford filed a second motion to recuse MacGregor on November 6, 2017, followed by a motion to change venue on November 9, 2017. The latter motion included an objection from Lankford to again continuing the trial, asserting that he had not waived his speedy trial rights.

The Idaho County prosecutor petitioned the district court for the appointment of a special prosecutor on December 12, 2017. On December 20, 2017, the district court ordered that a special prosecutor be appointed pursuant to Idaho Code section 31-2603. The Idaho County prosecutor then moved to continue the jury trial, citing difficulty finding a special prosecutor to prosecute the case on behalf of the State. On January 12, 2018, the Idaho County prosecutor filed an amended

---

do not amount to a denial of his Sixth Amendment rights." (citing *Harrison v. United States*, 392 U.S. 219, 221, n. 4 (1968); *Barker v. Wingo*, 407 U.S. 514 (1972); and *United States v. Simmons*, 536 F.2d 827 (9th Cir. 1976)).

petition for a special prosecutor, seeking the appointment of the Canyon County prosecutor and the Payette County prosecutor as special prosecutors. The district court eventually appointed three prosecutors from the Canyon County prosecutor's office as special prosecutors and on February 1, 2018, it rescheduled the trial for August 20, 2018.

On February 21, 2018, Lankford moved to dismiss for a speedy trial violation. Then, as he does now, Lankford pointed to the "nearly 35 years" that Lankford has been in prison as the delay. The same day, Lankford also filed a motion to dismiss based on the law of the case doctrine. On March 16, 2018, Lankford then moved to disqualify the presiding district judge for cause based on what Lankford claimed was "demonstrated bias and prejudice that has prevented [Lankford] from having a fair trial."

On April 3, 2018, the district court issued an order addressing most of the outstanding motions, including motions regarding certain evidence and the condition of jail facilities. On May 16, 2018, the district court also denied Lankford's motion to disallow the transcripts of previous trial testimony from deceased witnesses. Thereafter, in June 2018, Lankford sought permission to seek an interlocutory appeal to this Court on that denial. Permission to seek an interlocutory appeal was granted by the district court on June 25, 2018. After granting permission to seek permission from the Supreme Court, the district court vacated the trial date and reset the trial for November 2018. This Court ultimately denied the request for an interlocutory appeal on August 20, 2018. Ironically, had this Court granted Lankford's motion, his trial would have certainly been delayed even longer.

In September 2018, Lankford's attorneys sought leave to withdraw. In their motion, counsel detailed that they were seeking to withdraw because Lankford had requested "in writing and in person that [they] withdraw immediately from his case." The hearing on that motion took place on October 5, 2018. Within a week, the district court granted the motion to withdraw and allowed for a substitution of counsel. The district court initially denied a request from the State for a continuance of the November 2018 trial date after an objection at the hearing from Lankford. The State sought the continuance because the relatives of the victims were unavailable. Thereafter, the State again moved to continue the trial, citing, among other reasons, the need for defense counsel to prepare for trial. On October 29, 2018, the district court appointed new counsel for Lankford. Lankford's new attorneys did not object to the State's second request for a continuance,

18

nor did they object to the new trial date, which was reset for September 3, 2019. There were no further continuances and the trial commenced as scheduled.

As illustrated above, there were extensive and disruptive procedural events taking place between the remittitur and the eventual retrial—many of which resulted from Lankford's own actions. Lankford argues that he should not be penalized for moving to recuse a prosecutor early in the case. Indeed, he should not and will not. However, the recusal of a prosecutor is a major event, and a reasonable time should be allowed for a new prosecutor to prepare for trial, especially when it concerns a 35-year-old, double homicide case. Finding prosecutors who are willing and able to take on a complex case such as this on short notice is no simple task. In addition, Lankford later attempted to disqualify the presiding judge, only later to withdraw the request and seek permissive appeal on some of the very issues he now raises in this appeal. Finally, Lankford asked the district court—only two months before the November 2018 trial date—to dismiss his appointed trial counsel and appoint new defense counsel. Motions of this nature will almost inevitably lead to considerable delays in going to trial.

In sum, most of the delays here were precipitated by Lankford's own actions. In the case of the last and longest continuance, the delay was reasonably necessary to allow new prosecutors *and* new defense counsel time to prepare for trial. While we recognize that Lankford was free to file his motions and seek the relief to which he believed he was entitled, he was not free from the natural consequences of his actions when they affected the trial court's ability to provide him both a fair *and* speedy trial. Therefore, we conclude that Lankford's collective actions below made the delay reasonable under the circumstances of this case. Accordingly, the district court did not err in its determination that the two-year delay in proceeding to trial was reasonable under both the Idaho and United States constitutions.

*3. Whether the defendant asserted his right to a speedy trial*

Lankford asserted his speedy trial right at least once. On February 21, 2018, Lankford moved the district court to dismiss for lack of a speedy trial. This was shortly after a new prosecutor had been appointed. In that motion, Lankford reminded the district court that he had not waived his speedy trial right. Importantly, however, Lankford did not reassert his right to a speedy trial later when the State moved to disqualify the Idaho Attorney General's Office as prosecutor and reappoint MacGregor. Likewise, there is no objection in the record from Lankford after the district court granted a continuance following the appointment of his new attorneys—the longest

19

continuance and the one that was necessarily granted to allow Lankford's new defense attorneys time to adequately prepare for trial. Therefore, we conclude that although Lankford did assert his right after the first continuance, he failed to do so later. Again, the later continuances were also unavoidable, due to the need for both the State and the new defense counsel to prepare for trial, and caused by his motion to recuse the prosecutor and his request for new counsel. After his early assertion of his right to a speedy trial, Lankford failed to reassert this right when the most considerable delays in the trial—often precipitated by his own actions—occurred.

4. *The prejudice to the defendant*

Concerning the prejudice prong of *Barker*, Lankford again relies on the overall length of the delay from the initial arrest—some 35 years—to argue that "the evidence and testimony to be presented has been known to the State since [Lankford's] first trial. Considering that 35 years had passed at the time Mark [Lankford] was preparing for his third trial, it is clear that the relevant testimony and evidence had already been gathered and that a new investigation would be unfruitful." However, as discussed above, there were extensive procedural events taking place between the remittitur and retrial. As noted above, much of the delay occurred at Lankford's request and should have been the reasonably expected result of the motions granted in his favor. The longest of the delays resulted from granting Lankford's motion for new counsel, so that defense counsel could prepare for trial. Clearly, it would have been far more prejudicial for the district court to require Lankford to proceed to trial with unprepared attorneys.

Considering all the factors from *Barker v. Wingo*, we conclude that while further inquiry is triggered by the length of the delay, the procedural history of this case does not give rise to a speedy trial violation. Accordingly, we affirm the district court's decision denying the motion to dismiss for a speedy trial violation.

## IV. CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.

Chief Justice BEVAN, Justice BRODY, and Justices Pro Tem BURDICK and MEYER **CONCUR.**